UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VERNICE S-P,

                 Plaintiff,

     v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

              Defendant.

Case No. 21 C 1214

Magistrate Judge Sunil R. Harjani

**MEMORANDUM OPINION AND ORDER**

Plaintiff Vernice S-P.[1] seeks to reverse the final decision of the Acting Commissioner of Social Security denying her applications for Disability Insurance Benefits and Supplemental Security Income. The Acting Commissioner moves for summary judgment affirming the decision. For the reasons set forth below, the Acting Commissioner's decision is affirmed.

## I. BACKGROUND

On May 18, 2017, Vernice fell from a chair while at work in her role in human resources. (R. 19, 178, 234, 257, 447). She received treatment and continued to work until November 2018. *Id*. at 19, 928. On March 11, 2019, Vernice applied for Disability Insurance Benefits ("DIB"), and on March 18, 2019, Vernice applied for Social Security Income ("SSI"). *Id*. at 13. Born on February 12, 1959, Vernice was 59 years old when she applied for DIB and SSI. *Id.* at 185. Vernice alleged disability as of November 28, 2018, due to lumbosacral spondylosis without myelopathy,[2]

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

[2] Lumbosacral spondylosis without myelopathy is "degenerative changes in the spine without neurologic deficits." *Nagel v. Colvin*, No. 14 C 8060, 2016 WL 278881, at *3 (N.D. Ill. Jan. 22, 2016).

myofascial pain,[3] high blood pressure disorder, chronic lower back pain with sciatica, herniated lumbar intervertebral disc, and carpal tunnel.

Vernice's claims were initially denied on August 7, 2019, and upon reconsideration on February 6, 2020. (R. 13). Following Vernice's written request for a hearing, on August 27, 2020, Vernice testified by telephone in front of Administrative Law Judge ("ALJ") Kimberly S. Cromer. *Id*. She testified at the hearing alongside vocational expert, Jesse Orgen. *Id*. On September 24, 2020, the ALJ issued a decision denying Vernice's applications for DIB and SSI and concluded that Vernice was not disabled. *Id*. at 13-25. The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.[4]

At step one, the ALJ determined that Vernice had not engaged in substantial gainful activity since November 28, 2018, the alleged onset date. (R. 15). At step two, the ALJ found that Vernice had the following severe impairments: degenerative disc disease of the lumbar spine,[5] myofascial pain, degenerative joint disease of the hip,[6] cervicalgia,[7] bilateral carpal tunnel syndrome, moderately diffused degenerative joint disease of the left shoulder, and obesity. *Id*. at 15-16. The ALJ determined that Vernice's impairments of fibromyalgia, cardiomegaly and aortic regurgitation, hypertension, prediabetes mellitus, vitamin D deficiency, and osteoporosis were

---

[3] Myofascial pain syndrome "is a chronic form of muscle pain that centers around sensitive (trigger) points in a person's muscles." *Milliken v. Astrue*, 397 F. App'x 218, 220 n.1 (7th Cir. 2010) (citation omitted).

[4] Because the regulations governing DIB and SSI are identical, the Court will cite solely to the SSI regulations found in 20 C.F.R. pt. 404.

[5] Degenerative disk disease is "a condition in which a damaged [spinal] disc causes pain." *Charles S. v. Saul*, No. 18-CV-1092-JPG-DGW, 2020 WL 489430, at *2 n.2 (S.D. Ill. Jan. 30, 2020) (citation omitted).

[6] Degenerative joint disease is "a form of arthritis characterized by degeneration of the bone and cartilage in the joint. *Alexander v. Astrue*, No. 09 C 3406, 2010 WL 3199356, at *1 n.3 (N.D. Ill. Aug. 10, 2010) (citation omitted).

[7] Cervicalgia is also known as neck pain. *Smith v. Berryhill*, No. 16 C 8424, 2017 WL 4150727, at *1 n.2 (N.D. Ill. Sept. 19, 2017).

non-severe because they did not exist for a continuous period of at least twelve consecutive months, were responsive to medication or treatment, did not require any significant medical treatment, or did not result in any continuous functional limitations. *Id*. at 16. At step three, the ALJ concluded that Vernice did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart. P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). *Id*. at 16-17.

At step four, the ALJ concluded that Vernice retained the residual functional capacity ("RFC") to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) with the following limitations:

> can never crawl or climb ladders, ropes, or scaffolds; no more than occasionally climb ramps or stairs, balance, stoop, crouch, or kneel; never work at unprotected heights or around hazardous machinery; never perform commercial driving; only occasionally operate foot controls bilaterally; only occasionally reach overhead bilaterally; no more than frequently handle, finger, or feel bilaterally; and ought to avoid concentrated exposure to vibration; with work on a flat even surface.

*Id*. at 17. As a result of the RFC determination, the ALJ concluded at step four that Vernice can perform past relevant work because it does not require the performance of work-related activities precluded by Vernice's RFC. *Id*. at 25. Specifically, at step five, the ALJ determined that Vernice could work as a human resources coordinator and as a human resource assistant. *Id*. Because of this determination, the ALJ found that Vernice was not disabled. *Id*. On January 12, 2021, the Appeals Council denied Vernice's request for review, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-4; *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020).

## II. <u>DISCUSSION</u>

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (internal quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Vernice makes three arguments in challenging the ALJ's opinion: (1) the ALJ improperly evaluated the opinions of consultative examiners, Dr. Reynaldo Gotanco and Dr. Bharati Jhaveri;

(2) the ALJ inappropriately discounted her treating physician's opinion, Dr. Vipuli E. Javesinghe; and (3) the ALJ erroneously discounted her subjective symptom allegations.[8]  For the reasons explained below, the Court affirms the ALJ's decision because her findings are supported by substantial evidence, which is only "more than a mere scintilla" and such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Biestek*, 139 S.Ct. at 1154.

## A.  Medical Opinions of the Agency Consultative Examiners

Vernice first argues that the ALJ improperly evaluated the opinions of consultative examiners Drs. Gotanco and Jhaveri in concluding that she could sustain a 40-hour workweek, stand and or walk six hours per workday, and she had no manipulative limitations.  Because Drs. Gotanco and Jhaveri did not opine that Vernice could not sustain a 40 hour-workweek in the Disability Determination Explanation (DDE), the ALJ's conclusion is not in error.  Moreover, the ALJ's opinions regarding Vernice's ability to stand or walk and handle, finger, and feel on a frequent basis were supported by substantial evidence.

Before delving into the issues, it is important to review two basic concepts.  First, an ALJ is entitled to rely on non-examining physicians. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (finding the ALJ was entitled to rely on non-examining physicians); *Moynihan v. Colvin*, No. 14 C 10063, 2016 WL 6582232, at *10 (N.D. Ill. Nov. 7, 2016) ("There is no prohibition on the ALJ relying on the opinions of nonexamining doctors."); *Ronning v. Colvin*, No. 13 CV 8194, 2015 WL 1912157, at *5 (N.D. Ill. Apr. 27, 2015) (ALJ may reasonably rely on DDS report).  Additionally, the Court does "not review medical opinions independently but rather review[s] the ALJ's weighing of those opinions for substantial evidence" and only "overturn[s] that

---

[8] Vernice has withdrawn her constitutional argument concerning the appointment of Andrew Saul as the Commissioner of Social Security. *See* Doc. [29].

weighing if no reasonable mind could accept the ALJ's conclusion." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022).

Second, the DDE is drafted by a state-agency consulting physician and a state-agency Disability Examiner ("DE"). *See* 20 C.F.R. § 404.1615(c)(1). Here, the thirteen-page forms for Vernice's benefits at the initial level and the sixteen-page forms at the reconsideration level make up her DDEs. (R. 60-72, 73-85, 88-102, 104-119). Vernice has four sets of forms, two at the initial level (one for DIB and one for SSI) and two at the reconsideration level (one for DIB and one for SSI). *Id.* The forms include various sections such as "Claimant Information," "Evidence of Record," "Medical Evaluation," "Residual Functional Capacity," "Assessment of Vocational Factor," etc. *Id.* Critical to the Court's analysis is first the section titled "Residual Functional Capacity" and second the section titled "Signatures." *Id.* at 67, 72, 80, 85, 97, 102, 113, 118.

### 1. Ability to Sustain a 40-Hour Workweek

Vernice first argues that the ALJ failed to address Drs. Gotanco's and Jhaveri's opinion that she was limited to less than sedentary work and is unable to sustain a 40-hour workweek. Doc. [17] at 7; Doc. [26] at 4-5. Venice's argument fails because neither Dr. Gotanco nor Dr. Jhaveri offered this opinion in the DDE, and her argument is based on a misreading of the record.

As previewed above, each DDE is drafted by a state-agency consulting physician and a state-agency DE. *See* 20 C.F.R. § 404.1615(c)(1). There are two relevant sections in the DDE form for the Court's analysis, the physical RFC and the Signatures section. The Court takes each in turn. First, on August 7, 2019, Dr. Gotanco signed the initial forms for the physical RFC section, and on February 2, 2020, Dr. Jhaveri signed the reconsideration evaluations. *Id.* at 67-70, 80-83, 97-100, 113-116. Both doctors explained Vernice's exertional limitations, provided specific diagnostic evidence to support their conclusion, and rated her limitations, including that she could:

(1) occasionally lift and/or carry twenty pounds, (2) frequently lift and/or carry ten pounds, (3) stand and/or walk for a total of four hours, and (4) sit for a total of about six hours in an eight-hour workday.  Both doctors also noted that Vernice had postural and environmental limitations.

Second, is a section titled "Signatures," which requires the signature of a Medical Consultant ("MC") or Psychological Consultant and the DE. (R. 72, 85, 102, 119).  In the initial form, under "MC/PC or SDM Signature," the form states, "Reynaldo Gotanco MD 001 08/07/2019." *Id*. at 72, 85.  Below Dr. Gotanco's name, the form provides "Disability Adjudicator/Examiner Signature:" followed by "Heather Snell 08/07/2019." *Id*.  In the reconsideration form, under "Adult MC/PC Signature," the form states, "Bharati Jhaveri MD 047 02/02/2020." *Id*. at 102, 119.  Below Dr. Jhaveri's name, the form provides "Disability Adjudicator/Examiner Signature:" followed by "Nichole Bolton 02/03/2020." *Id*.

Moreover, the Social Security Administration Program Operations Manual System ("POMS") provides additional background for the Court's analysis.  POMS explains that the role of the MC is to evaluate the sufficiency of the evidence and need for further testing, assess the existence and severity of impairments at step two of the sequential evaluation process, determine whether an impairment meets or equals the requirements of a listing in the Listing of Impairments (Listings) at step three of the sequential evaluation process, and assess the RFC and other specific medical issues. *See* DI 24501.001, "The Disability Determination Services (DDS) Disability Examiner (DE), Medical Consultant (MC), and Psychological Consultant (PC) Team, and the Role of the Medical Advisor (MA)," § B.3(a-d), https://secure.ssa.gov/poms.nsf/lnx/0424501001 (last visited October 24, 2022); *see also* 20 C.F.R. § 404.1616(a) (The MC "completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim.").  POMS also provides that the role of the DE includes the

7

evaluation of the vocational aspects of the case, including to "[d]etermine whether a claimant can perform past relevant work given his or her RFC at step 4 of the sequential evaluation process; and" to "[d]etermine whether a claimant can adjust to other work given the applicant's RFC, age, education, and work experience at step 5 of the sequential evaluation process." DI 24501.001, § B.1(c). Moreover, the vocational analysis occurs during the step five determination of the evaluation process. DI 24501.001, § B.1(c).

Here, Dr. Gotanco signed the RFC section of the initial DDE form and the last page under the signature section for "MC/PC Signature," and Dr. Jhaveri signed the RFC and signature section of the reconsideration form. (R. 70, 72, 83, 85, 100, 102, 116, 118). Immediately preceding the doctors' signatures in the RFC sections of the forms is the statement, "[t]hese findings complete the medical portion of the disability determination." *Id*. at 70, 83, 100, 116. As POMS explains, the role of the doctors was to complete the medical portion of the form and provide a physical RFC assessment. DI 24501.001 § B.1(c). POMS also provides that the "signature responsibilities" of the MC are to "[s]ign assessments and determinations; and [i]ndicate that his or her signature completes the medical portion of the disability determination." *Id.* at § B.4. Both doctors did so, and nowhere in the RFC section did either doctor opine that Vernice should be limited to less than sedentary work or that she cannot sustain a 40-hour workweek. (R. 67-70, 80-83, 97-100, 113-116). Indeed, it is not until the later section titled, "Assessment of Vocational Factors," that the DE determination is first made that Vernice's RFC has rendered her limited to less than sedentary work and unable to sustain a 40-hour workweek. *Id*. at 72, 85, 102, 118.

Persuasive to this Court's analysis is a similar inquiry in *Mason v. Berryhill*, No. 1:17-CV-209-PRC, 2018 WL 3617259 (N.D. Ind. July 30, 2018). In *Mason*, the court analyzed the claimant's argument that the ALJ failed to consider the doctor's opinion that she was unable to

sustain a 40-hour workweek. *Id*. at *5-6. There, the 40-hour workweek opinion was included only in the "Assessment of Vocational Factors" section of the DDE. *Id*. The court concluded that the claimant misread the doctor's RFC determination and explained that "[t]he statement in the 'Assessment of Vocational Factors' regarding Plaintiff's ability to sustain a 40-hour week in relation to the exertional level of her past relevant work and her current RFC for less than a full range of sedentary work is part of the Disability Examiner's function." *Id*. at 5.

In the present case, although the doctors signed the signature sections on the last page of each form, directly below their signatures was a second line for the signatures of the Disability Adjudicator/Examiner. (R. 72, 85, 102, 118). On that line, Heather Snell signed the initial forms, and Nichole Bolton signed the reconsideration forms. *Id*. Vernice claims that the doctor's signatures "strongly implies" that they reviewed and signed off on the vocational analysis, but she provides no caselaw to support her argument. Doc. [26] at 4. Vernice instead relies on *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) and *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). Doc. [26] at 4-5. Vernice points to the former to assert that a claimant with a chronic disease under continuous treatment with heavy drugs will have better and worse days and might not be able to hold a full time job. *Id*. at 4. Vernice cites the latter to assert that an ALJ is prohibited from only relying on a portion of the medical record without explaining why she rejected the remainder. *Id*. at 5. However, neither case discusses a limitation to less than 40 hours of work per week or an inability to sustain sedentary work in an Assessment of Vocational Factors of a DDE.[9]

In sum, the statement regarding Vernice's ability to perform sedentary work and sustain a 40-hour workweek is only located in the "Assessment of Vocational Factors" section of the DDEs, not the RFC section. (R. 72, 85, 102, 118). As in *Mason*, the Court finds that the statement is an

---

[9] Vernice also cites no authority to establish that a possible DE error constitutes a reason for remand.

administrative determination by DE's Heather Snell (in the initial forms) and Nichole Bolton (in the reconsideration forms). Because neither doctor opined that Vernice was limited to less than sedentary work and unable to sustain a 40-hour workweek, there was no inconsistency between the RFC findings of Drs. Gotanco and Jhaveri and the ALJ's ultimate opinion.

### 2. Ability to Stand and Walk for Six Hours per Eight-Hour Workday

Vernice next argues that the ALJ erred in rejecting the opinions of Drs. Gotanco and Jhaveri that she could only stand or walk four hours per workday by concluding Vernice could stand or walk six hours per workday. Doc. [17] at 8-9; Doc. [26] at 3-4. Here, the ALJ cited plenty of evidence to build a logical bridge; thus, her opinion is supported by substantial evidence.

Initially, Drs. Gotanco and Jhaveri opined that Vernice was capable of standing/walking for four hours in an eight-hour workday and sitting for six hours, with postural and environmental limitations. (R. 23, 68, 81, 98, 114). In the process of preparing Vernice's RFC, the ALJ considered the doctors' conclusions and disagreed. *Id*. at 23. After reviewing the record, she concluded that Vernice's "ability to stand/walk is not as restricted [as the doctors opined], as claimant's neurological and orthopedic records reflect that the claimant has exhibited a normal gait with normal strength." *Id*. The "burden of proving she is disabled" rests with Vernice. *Prill v. Kijakazi*, 23 F.4th 738, 746 (7th Cir. 2022). In crafting an RFC, an "ALJ is not required to rely entirely on a particular physician's opinion ..." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 635 (N.D. Ill. 2009). Instead, an ALJ has the final responsibility for determining a claimant's RFC and need not adopt any one doctor's opinion. *Fanta v. Saul*, 848 F. App'x 655, 658–59 (7th Cir. 2021).

Finally, an ALJ need only "minimally articulate" her reasoning so as to build an accurate and logical bridge from the evidence to her conclusions. *Rice*, 384 F.3d at 371.

In completing her analysis, the ALJ relied on contrary medical opinions and evidence, including records the doctors cited from 2018 through 2020 that reflected Vernice's normal gait with normal strength. (R. 23, 69-70, 82-83, 98-100, 115-116). Specifically, the ALJ cited the "RFC – Additional Explanation" summary of Vernice's medical records signed by Dr. Jhaveri on February 2, 2020, which include the following notes: (1) "Neuro exam dated 9/16/19 indicates clmt has 5/5 motor strength in all extremities. She is able to walk on toes, heels, and tandem gait without difficulty;" (2) "Treating source follow up dated 11/18/19 indicated that clmt's EMG was not very significant. Clmt stated that she did not think provider looked hard enough;" and (3) "Ortho exam dated 1/9/20 showed normal gait, strength, and sensation." *Id*. at 116. Going further, the ALJ's opinion included additional medical evidence supporting her finding. For example, the ALJ explained that Vernice's radiology imaging of the C-spine, analyzed by Dr. Beejal Y. Amin on April 8, 2019, "did not reveal evidence of cervical instability." (R. 20) (citing R. 777). Additionally, on September 16, 2019, Dr. Amin concluded that Vernice's "[s]ubjective complaints do not correlate with my objective findings including physical examination findings and radiologic examination findings. Therefore, I do not recommend surgical intervention." *Id*. at 787. The evidence shows contradictory medical records that the ALJ analyzed from the date of Vernice's alleged onset of disability in 2018 to 2020. While the record includes subjective complaints of pain and Vernice's concern that providers were not looking "hard enough," the record also includes

11

objective evidence of Vernice's ability to walk without difficulty, motor strength, "not very significant" EMG results, and no evidence of cervical instability.

For similar reasons, the ALJ did not play doctor by disagreeing with Drs. Gotanco and Jhaveri. Doc. [17] at 8-9; Doc. [26] at 2-3. The cases Vernice cites to argue the ALJ relied on her lay reading of the evidence are all distinguishable. *Id.* (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Engstrand v. Colvin*, 788 F.3d 655, 660-661 (7th Cir. 2015); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *Myles*, 582 F.3d at 677). In each case, the court explained that the ALJ improperly determined the need and effect for a hip replacement (*Stage*), interpreted medical test results (*Engstrand* and *Goins*), and reached their own conclusion regarding insulin (*Myles*). Contrary to the cases Vernice relies on, here the ALJ did not provide medical conclusions reserved for a doctor or interpret medical test results. Instead, as required by the regulations, the ALJ evaluated competing medical opinions and evidence and relied on the record evidence to reach a conclusion. As such, the Court can trace the path of the ALJ's reasoning regarding Vernice's ability to walk and stand, and her conclusion is supported by more than a mere scintilla of evidence.

### 3. Handle, Finger, and Feel on a Frequent Basis

Vernice also claims that the ALJ erroneously concluded that she could handle, finger, and feel on a frequent basis and that because the ALJ questioned the Vocational Expert ("VE") regarding the impact of a person's ability to use her hands on an occasional basis, the ALJ was required to incorporate the VE's opinion into the RFC. Doc. [17] at 9; Doc. [26] at 8. The Court disagrees with both claims.

To start, resolving conflicts between various medical opinions falls under the ALJ's purview. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts ... is exactly what the ALJ is required to do."); *see also Ehrhart v. Sec'y of*

12

*Health & Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992) ("[R]esolution of evidentiary conflicts lies within the exclusive domain of the ALJ[.]").  In reviewing the record and crafting an RFC, an ALJ is not required to explain every limitation she includes in the hypotheticals to the VE. *See Boynton v. Apfel*, 172 F.3d 52, at *4 (7th Cir. 1999) ("the ALJ did not need to explicitly address the second hypothetical since his findings implicitly reject the basis for that question."); *see also Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) ("The ALJ is not required to mention every piece of evidence"); *Guranovich v. Astrue*, No. 09 C 3167, 2011 WL 686358, at *24 (N.D. Ill. Feb. 15, 2011), *aff'd,* 465 F. App'x 541 (7th Cir. 2012) ("An ALJ is not required to mention VE testimony rendered irrelevant by the RFC the ALJ adopts.").

In the present case, the record contains competing medical opinions:  Dr. Jayesinghe opined that Vernice could handle and finger approximately twenty-five percent of the time or on an occasional basis, while Drs. Gotanco and Jhaveri opined that Vernice had no manipulative limitations. (R. 69, 82, 98, 115, 684).  At the hearing, the ALJ also posed numerous hypotheticals to the VE. *Id*. at 53-57.  She first asked the VE to consider an individual in the light exertional capacity with various protections, including bilateral handling, fingering, and feeling at frequent. *Id*. at 53-54.  The VE stated that Vernice's past jobs would be available. *Id*. at 54.  The ALJ then replaced light exertion with sedentary under the same protections as the first hypothetical. *Id*. Again, the VE responded that Vernice's past jobs would be available. *Id*.  Third, the ALJ asked the VE to consider light exertion and occasional bilateral handling and fingering with frequent feeling. *Id*.  The VE stated that Vernice's past jobs would not be available. *Id*. at 54-55.  Fourth, the ALJ asked whether a sedentary individual with occasional bilateral handling, fingering, and feeling would be able to perform Vernice's past work. *Id*. at 55.  The VE responded no. *Id*.

13

After reviewing the record, the ALJ concluded that Vernice could "no more than frequently handle, finger, or feel bilaterally." *Id*. at 17.[10]  Contrary to Vernice's claims that the ALJ rendered a medical opinion and had an obligation to explain every hypothetical to the VE, she did not. Vernice relies on two authorities in support of her claim, *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019) and *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010).  In *Crump*, the court held that the ALJ improperly discounted the treating psychiatrist's opinion, recognized the claimant's concentration, persistence, or pace difficulties when he incorporated specific limitations into a second hypothetical question asked to a VE, and failed to acknowledge the VE's response to that hypothetical. 932 F.3d at 570-572.  In *Suide*, there was an evidentiary deficit left by the ALJ's rejection of a physician's reports because "[t]he rest of the record simply d[id] not support the parameters included in the ALJ's residual functional capacity determination." 371 F. App'x at 689-90.  Unlike in *Crump* and *Suide*, the ALJ here did not discount Dr. Jayesinghe's opinion improperly, and the record supports the RFC determination.  The ALJ relied on the opinions of Drs. Gotanco and Jhaveri who disagreed with Dr. Jayesinghe's conclusion. (R. 69, 82, 98, 115); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012) ("ALJ did not err or improperly 'play doctor' by examining the medical record and determining that [a doctor's] conclusions were unsupported by his own treatment notes or contradicted by other medical evidence.").

In addition, Vernice's claims are analogous to those in *Boynton v. Apfel*.  In *Boynton*, the Seventh Circuit discussed two hypothetical questions posed by the ALJ to the VE where the ALJ's opinion did not address the second hypothetical. 172 F.3d 52, at \*2.  In response to the first, the VE testified that the claimant would be able to perform their past relevant work. *Id*.  But in response

---

[10] The ALJ also explained that "[i]n consideration of the claimant's CTS [carpal tunnel syndrome], the undersigned limited the claimant to no more than frequent handling, fingering, or feeling bilaterally." (R. 22).

14

to the second with an additional limitation, the VE responded that the aforementioned jobs would not be available to such an individual. *Id*. The Seventh Circuit agreed with the district court's analysis – "[t]he fact that the second hypothetical was posed at the hearing does not mean that the ALJ was required to explain why he rejected the answer." *Id*. The same principle applies here. In the case before the Court, the ALJ's role required her to resolve the conflict between three doctors' opinions, which she did to propose the RFC. (R. 17). In rejecting the opinion of Dr. Jayesinghe, the ALJ also implicitly rejected the basis for the hypothetical questions that would limit Vernice to occasional handling, fingering, and feeling. As Vernice concedes, an ALJ is not required to rely on and adopt one single medical opinion. Doc. [26] at 8. The ALJ also relied on additional medical evidence in the record. For example, the ALJ addressed Dr. Amin's finding that "imaging was not as severe as the claimant's subjective complaints." (R. 20, 787). Dr. Amin's progress notes also stated, "Motor examination: 5/5 strength in all 4 extremities. Sensory: intact to light touch in all 4 extremities." *Id*. at 779, 783, 787. As in *Boynton*, the ALJ rejected Dr. Jayesinghe's opinion that Vernice's ability to handle, finger, or feel was so severe that it would require an occasional limitation. As a result, the ALJ's opinion was supported by substantial evidence.

## B. Weight Afforded Treating Physician's Opinion

Vernice next contends that the ALJ improperly rejected the opinion of her treating physician. Doc. [17] at 10-12; Doc. [26] at 6-8. Given her filing date, the ALJ's evaluation of the medical opinion evidence was subject to new regulations pertaining to claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c (2017). Under the regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id*. at § 404.1520c(a). The regulations direct the ALJ to consider medical opinions and prior administrative medical findings using several factors, including supportability, consistency,

relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *Id.* at § 404.1520c(a), (c). Supportability and consistency are the most important factors. *Id.* at § 404.1520c(a). In assessing supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ... the more persuasive the medical opinions ... will be." *Id.* at § 404.1520c(c)(1). As to consistency, "[t]he more consistent a medical opinion ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." *Id.* at § 404.1520c(c)(2).

Vernice argues that rejecting Dr. Jayesinghe's opinion while relying on Dr. Gotanco's and Jhaveri's opinions is contrary to the regulations and not logical. Doc. [17] at 10. However, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Despite the regulations' preference for treating physician opinions, there is no categorical bar prohibiting ALJs from giving greater weight to non-examining state agency physicians. *See Primm v. Saul*, 789 F. App'x 539, 545 (7th Cir. 2019) ("[a]n ALJ is entitled to credit the opinion of a non-treating physician over a treating physician if doing so is supported by evidence."). In fact, such decisions are reviewed merely for substantial evidence and are, not infrequently, upheld. *See, e.g.*, *Ketelboeter v. Astrue*, 550 F.3d 620 (7th Cir. 2008) (substantial evidence supported ALJ's decision to give greater weight to state agency doctor's opinions than that of treating physician where record contained little objective evidence supporting alleged severity of symptoms and treating physician's opinion was based almost entirely on claimant's subjective complaints and was internally inconsistent). The reasons provided by the ALJ for finding Dr. Jayesinghe unpersuasive are explained and supported by the record.

First, the regulations permit the ALJ to consider the length of a claimant's treatment relationship. 20 C.F.R. § 404.1520c(c)(3)(i); *see also Horton v. Colvin*, No. 3:13-CV-00511-NJRCJP, 2014 WL 4961543, at *9 (S.D. Ill. Oct. 3, 2014) (affirming where the ALJ "noted the length of treatment did not cover the entire relevant time period of Plaintiff's injuries"); Doc. [17] at 10 (Vernice acknowledges that the regulations identify "several factors in weighing medical opinions, including the nature and length of the relationship with the claimant.").  In this case, Dr. Jayesinghe first treated Vernice on February 27, 2019. (R. 666).  Less than three months later, on May 22, 2019, Dr. Jayesinghe completed the questionnaire for Vernice's disability claim. *Id*. at 681-684.  The ALJ properly pointed out that Dr. Jayesinghe only treated Vernice for three months when he rendered his opinions. *Id*. at 24 (citing R. 61).

Second, the ALJ observed that Dr. Jayesinghe's opinion was inconsistent with his notes and other evidence in the record. (R. 24).  The ALJ determined that supportability and consistency, the two most important factors, were lacking.  The ALJ explained that Dr. Jayesinghe's restriction to lying down for several hours a day lacked an explanation and support in the treatment records. *Id*.  Regarding Vernice's neck, the ALJ noted that except for her first visit, she exhibited a normal range of motion and, in March 2019, had negative Tinels and Phalens (tests for carpal tunnel). *Id*. (citing R. 884, 888, 891, 895).  The ALJ also explained that Dr. Jayesinghe's limitations were inconsistent with other record evidence. *Id*. at 24.  For example, at an April 2019 neurosurgery consultation, Vernice exhibited motor strength in all four extremities with normal sensation, was able to walk heels, toes, tandem gait without difficulty, and surgery was not recommended as imaging was not as severe as subjective complaints. *Id*. (citing R. 777, 779, 783).  Orthopedic treatment notes from February 2020 also indicated Vernice's gait, coordination and balance, and strength and sensation were normal. *Id*. at 24 (citing R. 850-851, 865).

Ultimately, the ALJ's decision is supported by more than a mere scintilla of evidence and contains no error of law. The ALJ provided three "good reasons" for rejecting the opinions of Dr. Jayesinghe: duration of treatment, inconsistency with treatment notes, and inconsistency with the record. *Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013) (requiring "good reasons" to discount a treating physician's opinion). In reality, Vernice asks this Court to reweigh the evidence already considered by the ALJ. Doc. [17] at 10-11. However, the ALJ does not need to mention every piece of evidence in the record, and to the extent Vernice is asking the Court to reweigh the evidence, the Court will not do that. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020) (The court "will not reweigh evidence or substitute [its] judgment for [that of] the ALJ's."); *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (The Seventh Circuit has held that "an ALJ's adequate discussion of the issues need not contain a complete written evaluation of every piece of evidence.") (citations omitted) (internal quotes omitted).

## C. Subjective Symptom Evaluation

Turning to her final challenge, Vernice claims the ALJ rejected her assertions of pain, her allegations of side effects of medication, and her symptoms generally because she could engage in some daily activities. Doc. [17] at 12-14; Doc. [26] at 9-13. In the case before the Court, the ALJ found that the record failed to support Vernice's claim that her pain and other symptoms from her impairments rendered her unable to work, and none of Vernice's objections show that the ALJ's assessment was patently wrong.

In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other

measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts*, 27 F.4th 1273, 1278 (7th Cir. 2022)). "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts*, 27 F.4th at 1278.

### 1.    Exacerbation of Pain

First, Vernice argues that the ALJ's conclusion that her pain began only after lifting more than twenty pounds or standing more than six hours is in error. Doc. [17] at 12-13; Doc. [26] at 9-10. As explained earlier, the ALJ's conclusion regarding Vernice's ability to walk and stand for six hours per eight-hour workday is supported by substantial evidence. *See infra* at 10-12. An "ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *see also Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) (selective summaries of evidence are appropriate). Ultimately, the remainder of Vernice's argument essentially amounts to a request that the court reweigh the evidence and second guess the ALJ's conclusion regarding the severity of her pain, including whether it is chronic and the resulting limitations.

In providing their opinions, Drs. Gotanco and Jhaveri concluded Vernice could occasionally lift and/or carry 20 pounds. (R. 68, 81, 98, 114). At step three of the evaluation process, the ALJ evaluated the medical records for chronic pain and determined, "the record shows that her examinations revealed no neurological deficits and she exhibited normal gait, motor strength in the extremities, and reflexes. There is no evidence that the claimant's chronic pain, in combination with her other impairments, meets or equals any of the Listings as the claimant is able to use her extremities effectively." *Id*. at 17. At step five, the ALJ crafted an RFC and concluded, "in consideration of the claimant's reports of neck, back, hip, and shoulder pain, the undersigned limited the claimant to light level work, as lifting more than 20 pounds occasionally could put undue pressure on the claimant's spine and joints or stress on her neck, thereby exacerbating her pain. . . Limiting the claimant to lifting no more than 20 pounds occasionally also takes into consideration her left shoulder complaints." *Id*. at 21-22.

Moreover, the ALJ analyzed Vernice's allegations of pain throughout the record to build a "logical bridge." For example, the record included: (1) Vernice's testimony regarding her lumbar spine, shoulder, neck, wrist, and hand pain as well as her use of medication to help with pain; (2) diagnosed history of degenerative disc disease of the lumbar spine, myofascial pain, degenerative joint disease of the hip, cervicalgia, bilateral carpal tunnel syndrome, and degenerative joint disease of the left shoulder; (3) various treatments including physical therapy, chiropractic care, electrical stimulation, lidocaine ointment, a TENS unit, and refusal of injections; (4) treatment notes where Vernice's condition improved, she indicated her pain was at a level of 1 to 2 on a scale from 1 to 10, and where she was in no distress and exhibited normal gait, coordination and balance, and strength and sensation; and (5) objective testing, including MRIs and x-rays. *Id*. at 18-21 (citations omitted). While Vernice provided subjective testimony and complaints to doctors

regarding her pain, the record evidence also noted improved conditions, low levels of pain, no distress, and normal gait, coordination, balance, strength, and sensation.

Further, the ALJ acknowledged Vernice's diagnoses and treatment and referenced numerous medical records and evidence in crafting the RFC. (R. 18-21). Vernice is correct that the ALJ's analysis included Dr. Amin's radiographic imaging findings: "MRI of the cervical spine is negative for severe spinal cord or nerve root compression. MRI of the lumbar spine is negative for severe central canal or foraminal stenosis. F/E lumbar spine x-rays are negative for dynamic instability." *Id*. at 787. Indeed, the ALJ also included Dr. Amin's conclusion that Vernice's "Subjective complaints do not correlate with my objective findings including physical examination findings and radiologic examination findings. Therefore, I do not recommend surgical intervention." *Id*. However, Dr. Amin's records were not the only evidence the ALJ relied on. The ALJ also confronted records that Vernice relied on where she described her pain as constant and worse with motion and walking, her diagnosis of a herniated disc and referral to orthopedic spine, statements that the chiropractor was more helpful than physical therapy, and denials of balance difficulty and weakness of her hands. Doc. [17] at 12-13; (R. 658-659, 668-669, 777).

In sum, while the record contains evidence that could be construed as favorable to Vernice, the ALJ noted some of that evidence and sided with her to a degree by determining she had severe impairments and needed some limitations on even "light" duties. This is not a case where an ALJ ignored evidence contrary to her conclusion, and nothing in the ALJ's opinion rises to the level of a patently wrong determination by the ALJ. As discussed, the ALJ had substantial evidence in the record to support her finding that Vernice's impairments were less severe than her subjective symptoms indicated.

### 2.    Side Effects of Medication

Vernice next asserts that the ALJ improperly rejected her allegations regarding the side effects of her medication and claims that she was only alert at examinations because she was not regularly taking pain medication. Doc. [17] at 13; Doc. [26] at 12-13.  The regulations are clear that in evaluating the intensity, persistence, and limiting effects of an individual's symptoms, an ALJ should consider the "side effects of any medication an individual takes or has taken to alleviate pain or other symptoms." SSR 16-3p, at *8; *see also* CFR 404.1529(c)(3)(iv).  Here, the ALJ considered Vernice's subjective statements to doctors and in her testimony and concluded that based on the record and objective evidence that Vernice was described as alert and oriented, not in distress, and there was no evidence of her falling. (R. 18, 22-23).

First, Vernice relies on her testimony to the ALJ that the pain medications caused dizziness, lightheadedness, and headaches. Doc. [17] at 13.  Her testimony states, "all I can do with the medication is basically lie down in order to make sure I don't fall, which I have fallen a couple of times." (R. 42).  Second, Vernice cites her subjective statements to two doctors regarding the side effects.  On February 27, 2019, Dr. Jayesinghe noted that Vernice was reluctant to try medications, he advised her to consider other medications for pain management, and Vernice stated Flexeril and Zanaflex made her dizzy. *Id*. at 669.  On April 15, 2019, Dr. Jayesinghe noted Vernice was "[u]nable to take any meds as all make her drowsy." *Id*. at 673.  On April 17, 2019, Vernice informed Dr. Kuo that she tries not to take pain medications because they make her feel tired and uncoordinated. *Id*. at 659.  Third, Vernice relies on the questionnaire Dr. Jayesinghe completed for the disability process, where he noted the side effects of medication, including "dizziness, drowsiness, so unable to function on any medication." *Id*. at 682.

However, the ALJ did not ignore Vernice's alleged side effects caused by medication. Rather, the ALJ noted that Vernice "testified that her medication helps with her pain but causes side effects. The claimant testified that her medications cause dizziness, lightheadedness, and sometimes headaches and has caused her to fall." (R. 18.). The ALJ concluded that "[d]espite claimant's reports that her medication causes drowsiness, her treatment records reflect that she generally appears alert and oriented. Additionally, despite the claimant's allegations, the record does not reflect any evidence of falling, and treatment notes reflect that the claimant has generally appeared in no distress." *Id*. at 22-23 (citations omitted). Specifically, the ALJ relied on numerous medical records from March 28, 2019, through June 25, 2020, that described Vernice as: "alert and oriented to person, place, and time," "oriented to person, place and time", and "alert and oriented x 3." *Id*. at 779, 851, 888, 891, 895, 898, 904, 908, 922, 932.[11]

Going further, Vernice argued that she could not take pain medication due to the side effects and, as a result, suffered from pain because she was not regularly taking medication. Doc. [17] at 13. In support of her argument, Vernice relied on her testimony to the ALJ, her statement to Dr. Kuo, her statements to Dr. Jayesinghe, and Dr. Jayesinghe's questionnaire. (R. 50, 659, 669, 673). However, the ALJ discussed Vernice's subjective statements and analyzed various medical records. In fact, the ALJ identified evidence stating that at appointments, Vernice was in "no distress" or "no acute distress." *Id*. at 779, 851, 888, 891, 895, 898, 904, 908, 922, 932. In addition, the medical record from February 13, 2020, noted that Vernice was negative for dizziness, lightheadedness, and headaches. *Id*. at 851. In addition, other than Vernice's testimony that the medication had caused her to fall "a couple of times," there was no evidence in the record of such

---

[11] The record is replete with additional evidence that supports the ALJ's finding that Vernice was alert and oriented and in no acute or apparent distress. (R. 321, 328, 399, 427, 439, 455-456, 467, 476, 489, 504-505, 558-559, 565, 571, 578, 596-597, 603, 609, 616, 659, 668, 783, 787, 831, 865, 884-885).

falls. *Id.* at 42. Thus, the ALJ's lengthy analysis suggests that she considered Vernice's alleged side effects in evaluating the intensity, persistence, and limiting effects of her symptoms and whether she could take the medication due to side effects. Because the ALJ provided an analysis supported by the record, the Court does not find that her conclusion was patently wrong.

**3.     Activities of Daily Living**

Vernice's final argument is that the ALJ erroneously rejected her allegations because she could engage in some daily activities. Doc. [17] at 14; Doc. [26] at 11. As a general matter, the Seventh Circuit cautions against an ALJ equating the claimant's ability to perform activities of daily living ("ADLs") with their ability to work full time. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). However, "an ALJ is not forbidden from considering statements about a claimant's daily life. In fact, agency regulations instruct that, in assessing a claimant's symptoms, the evidence considered includes descriptions of daily-living activities." *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020) (citing 20 C.F.R. § 404.1529(a), (c)(3)).

Contrary to Vernice's characterization, the ALJ did not only discuss her ADLs to demonstrate that she can work full time or hold a job outside the home. (R. 23) (citing R. 222-226). Rather, as the regulations instruct, the ALJ considered Vernice's ADLs, her lack of treatment or medication for mental limitations, and her absence of complaints to treating sources regarding memory or concentration issues to conclude there was no indication that she has mental functional limitations. *Id*. at 23. In support, the ALJ considered the evidence in the record, including the Function Report that Vernice completed. *Id*. (citing R. 222-226). In doing so, the ALJ identified evidence that Vernice can prepare meals daily, clean and do laundry, drive, go outside alone, shop at stores, and handle her own finances. *Id*. In discussing the persuasiveness of Dr. Jayesinghe's opinion, the ALJ also noted that "physical examinations do not indicate . . . difficulties with

activities of daily living." *Id*. at 24. At no point did the ALJ equate Vernice's ADLs with an ability to work full time. Indeed, Vernice concedes that the ALJ cited Vernice's ADLs in evaluating her concentration. Doc. [26] at 11.

Notwithstanding the ALJ's lack of obligation to discuss every piece of evidence, the ALJ did not ignore the evidence that Vernice claims supports the credibility of her symptoms. In detail, the ALJ considered Vernice's reports, noting Vernice testified: (1) she needs assistance getting up after sitting, climbing stairs, and getting in and out of cars; (2) she can stand for 30 minutes and walk ½ block before she starts feeling pain in her back and legs requiring her to rest; (3) lying down is her most comfortable position, and she does so for about 3 hours a day; (4) her doctor recommended that she use a cane but she cannot afford it; (5) she also experiences pain and numbness in her wrists and hands; (6) she is scheduled to undergo release surgery for CTS; (7) she has difficulty typing because the numbness comes and goes and she can type for a limited period of time before needing to stop due to pain; (8) she drops things, but can manipulate buttons; (9) she may be able to carry a water bottle, but she cannot open one; (10) she treats her hand and wrist pain and numbness with a combination of pain medication and wrist braces. (R. 18).

In essence, Vernice appears to complain about the ALJ's weighing of the evidence regarding her subjective symptoms, but the Court cannot reweigh the conflicting evidence. *Grotts*, 27 F.4th at 1279 (rejecting claimant's criticism of the "ALJ's analysis of her daily functioning, her good and bad days, and her pain" as improperly inviting the Court to reweigh the evidence). Vernice does not challenge the accuracy of the ALJ's characterization of her ADLs. Instead, she relies on *Plessinger v. Berryhill*, 900 F.3d 909, 917 (7th Cir. 2018) and *Spicher v. Berryhill*, 898 F.3d 754. 757 (7th Cir. 2018)[12], two cases where the court remanded because the ALJ failed to

---

[12] There is no mention of subjective symptoms in *Spicher*, 898 F.3d 754.

build an "accurate and logical bridge." Doc. [17] at 14; Doc. [26] at 11. While Vernice may disagree with how the ALJ weighed the evidence in assessing the severity and frequency of her symptoms, the ALJ here addressed the relevant evidence in her decision and provided specific reasons supported by the record to support her subjective symptom determination.

Bringing it all together, the ALJ rejected Vernice's subjective symptoms because the ALJ identified contrary objective evidence. Regarding Vernice's allegations of pain, the ALJ pointed out improved conditions, low levels of pain, no distress, and normal gait, coordination, balance, strength, and sensation. In the context of side effects of medications, the ALJ pointed out record evidence where Vernice was described as alert and oriented and not in distress. Regarding ADLs, the ALJ explained that Vernice was able to prepare meals daily, clean and do laundry, drive, go outside alone, shop every other week at stores, and handle her own finances. In fact, Dr. Jayesinghe concluded that physical examinations did not indicate difficulties with ADLs. Unlike the cases Vernice relies on, the ALJ built a logical bridge between the evidence and her conclusion. Thus, the Court finds that the ALJ's subjective symptom analysis was not patently wrong and defers to it. *Apke v. Saul*, 817 F. App'x 252, 258 (7th Cir. 2020).

## III.  CONCLUSION

For the reasons set forth above, the Court denies Plaintiff's request for reversal and remand [17], grants the Acting Commissioner's motion for summary judgment [24], and affirms the ALJ's decision.

**SO ORDERED.**

Dated: October 31, 2022

_____
Sunil R. Harjani
United States Magistrate Judge